[No. 7518. Decided May 12, 1909.]

ELIAS LARSEN, *Respondent,* v. COVINGTON LUMBER
COMPANY, *Appellant.*[1]

MASTER AND SERVANT—VICE PRINCIPALS—EVIDENCE—CONCLUSION OF WITNESS. The statement by plaintiff and his expert witness that in their opinion a head sawyer in a mill was in full charge of all the workmen, negatived by the facts detailed, is a mere conclusion and of no probative force.

SAME—FELLOW SERVANTS—HEAD SAWYER AND TALLYMAN. The head sawyer in a mill (the sawyer in charge of the "head" saw) is not a vice principal as to a tallyman, marking the lumber after it had been cut, who was not in the sawyer's crew and over whom the sawyer had no control in the performance of his duties.

[1]Reported in 101 Pac. 717.

SAME — CONTRIBUTORY NEGLIGENCE — EVIDENCE — SUFFICIENCY.  A tallyman, marking lumber near the rolls as it came from the head saw, who was injured when a log from the saw struck a cant that was being returned from a cut-off saw to be transferred to another section of rolls, is guilty of contributory negligence, where it appears that he was facing the log and saw it thirty seconds before it would strike the cant, that he took hold of the cant to throw it on to the other set of rolls, needlessly assuming the risk of removing the cant in reliance upon his ability to do so in time, when he had several avenues of escape and ample time to get out of the way.

Appeal from a judgment of the superior court for King county, Tallman, J., entered March 4, 1908, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained by an employee in a sawmill.  Reversed.

*Graves, Palmer & Murphy* and *Charles H. Winders*, for appellant.

*Blaine, Tucker & Hyland* and *Robert C. Saunders*, for respondent.

CROW, J.—Action by Elias Larsen against the Covington Lumber Company, a corporation, to recover damages for personal injuries.  From a verdict and judgment in plaintiff's favor, the defendant appeals.

We will only consider appellant's contention that the trial court erred in denying its challenge to the evidence, and its motion for a directed verdict.  Appellant owns and operates a sawmill in King county, in which the respondent, at the time of his injury, was employed as marker or tallyman.  Numerous acts of negligence were pleaded, but they were all abandoned on the trial except the alleged negligence of one Charles Crawford, who was the appellant's head sawyer and who was so designated, not because his position was necessarily superior to other employees, but because he was in charge of and operated the saws known as head saws.  The mill was operated from west to east.  Logs were brought to the deck, transferred to the carriage, were cut by the head saws, and thence the lumber passed to the rolls, the edger, and cut-off saws,

to be cut into desired widths and lengths. At the head or west end of the mill were two large circular head saws, one above the other. To their immediate right and south was the carriage way upon which the log carriage moved east and west. The carriage would be brought to the west, and loaded with a log, which was fastened thereon by a workman known as the "dogger," and adjusted to the cut by another workman known as the "setter," both of whom acted in obedience to signals given by the head sawyer. The sawyer then caused the carriage to move eastward until the saws engaged the log throughout its entire length, when he caused the carriage to move backward for a resetting of the log, preparatory to another cut. The pieces thus cut from the logs passed eastward to other operatives. The head saws rested on a large frame, immediately over which a screen was suspended to protect the sawyer from dust and splinters. In front of the frame, and to the left or north of the carriage way, was a system of live rolls, known as "section No. 1," twenty-six and one-half inches high, and extending easterly about forty-eight feet. These rolls were controlled by a lever in charge of the offbearer, who stood at their west end. When a clear piece of lumber was cut from a log it dropped on this first section of rolls and then, by a system of transfers, also operated by the offbearer, was transferred towards the north to other rolls immediately in front of the edger saw, and thence by the edgerman into the edger itself, to be cut into desired widths. The lumber was then transferred from the edger to the respondent as tallyman, who marked it, and it then passed to the cut-off saw to be cut into the lengths indicated by him.

In the same line with the first section of live rolls was a second section, separated therefrom by a passageway about twenty-one inches wide, and then extending east about thirty-two feet to the cut-off saw, which was about eighty feet from the head saws. The respondent's position was along the second section of the rolls, near the edger and slightly to the east of the first section. The second section of rolls was con-

trolled and operated by a lever located at its eastern end, in charge of the cut-off sawyer. The respondent as marker, however, could by signals direct the cut-off sawyer in its operation when it became proper or necessary for him to do so. He marked and tallied the lengths into which the cut-off sawyer was to cut the lumber passed to him. If the cut from a log was a slab, it at once passed over both sections of rolls to the cut-off sawyer who cut it into wood, and sent it out of the mill through a conveyor. If the cut from the log was all clear lumber, it was at once transferred to the rolls in front of the edger, thence through the edger, past the respondent, was marked by him, and thence sent to the cut-off saw. If the cut from the log was part clear lumber and part slab, it was at once sent over both sections to the cut-off sawyer, who cut the slab part into wood and, when he had a favorable opportunity, sent the good piece or cant back over the second section of rolls, which he reversed for that purpose, and on to the first section, to be thence transferred to the rolls in front of the edger.

It was during the performance of this last-mentioned work that the respondent was injured. The head sawyer had cut from the log a piece of partly slab and partly good lumber, which was sent over both sections to the cut-off sawyer, who cut the slab into wood. He then looked towards the head sawyer and, having seen that he was giving a signal to the setter, reversed the second section of rolls and returned the cant to the first section. The cant was about fourteen feet in length and ten to fourteen inches in width, and the respondent took hold of it with his hands to assist in transferring it to the rolls in front of the edger. Either through his efforts or in some other manner, it assumed an angular position across the east end of the first section of rolls, and came in contact with the log on the advancing saw carriage, which pushed it and the respondent against the edger and severely injured him.

All of the above facts are shown by undisputed evidence.

The respondent contends that the head sawyer was negligent in running the log and carriage against the cant, and in not stopping the carriage until the cant could be transferred to the edger rolls.    The evidence further shows that the log was about fifty inches in diameter at its larger end, and fifty feet in length; that it required one minute to saw its entire length; that three sets of saws, the head saws, the edger saws, and the cut-off saw, were operated by different employees; that the head sawyer, the edgerman, and the respondent as marker, each had written orders from the superintendent of the mill, detailing the sizes and quantity of lumber to be cut, and directing their work; and that these written orders gave information to the head sawyer as to the thickness of his cuts, to the edgerman as to the width of his, and to the respondent, as to the lengths he was to mark.

Respondent contends (1) that it was the head sawyer's duty to maintain a constant watch along both sections of rolls, and see that they were clear before moving the carriage; that if he had done so he could have stopped the carriage before the log struck the cant, and that his failure to do so was negligence; (2) that he was the vice principal of the appellant in general charge of the saws, rolls, and men, and that his negligence was therefore the negligence of the master.   The appellant contends (1) that the head sawyer's duties were not those claimed by respondent; (2) that he was not negligent; (3) that he was not a vice principal, but was respondent's fellow servant; and (4) that respondent was guilty of contributory negligence.

We think appellant's contentions are all sustained by undisputed evidence.   There is no competent evidence showing or tending to show that the head sawyer was authorized to give orders to the respondent, or to any of the workmen other than the dogger and setter, or that he had any control over them.   We do not overlook the fact that the respondent himself and one Calderwood, an alleged expert, who had never worked in the mill, in substance testified that, in their opinion,

Crawford, as head sawyer, was in full charge of the workmen. Respondent's testimony on this point was only the statement of his conclusions and opinion, or an effort upon his part to invade the province of the jury, and determine the ultimate facts which they were to find. The elementary facts detailed by him and his general evidence negative the conclusion which he attempted to draw, the statement of which was elicited by leading and suggestive questions ingeniously propounded by his counsel and permitted over appellant's vigorous objections. The evidence of Calderwood was improperly admitted over appellant's objection, being incompetent, not the statement of any fact, and having no probative force or value.

Our conclusion, from the undisputed and competent evidence, is that the head sawyer was not appellant's vice principal, but respondent's fellow servant; that he was not negligent, and that, even though he had been negligent, appellant would not be liable, there being no contention that the sawyer was incompetent. Respondent was an experienced man. He had worked in the mill for six months, and was familiar with his duties and the entire situation. He testified that, shortly after he commenced work, the head sawyer on one occasion signalled him to remove a cant from the live rolls, and delayed moving the carriage until he did so; that respondent moved the cant, and that thereafter he understood and discharged his duties in that regard without further instruction, always relying upon the head sawyer to withhold the carriage until the rolls were clear. There is no evidence that it was the duty of the head sawyer to give any such direction or signal to the respondent, or that he did so on any occasion other than the one mentioned. The mere fact that, in a single instance, he volunteered to give such a direction or suggestion does not sustain respondent's contention that it was either his duty or his custom to do so.

Contending that the head sawyer was a vice principal, the respondent cites: *O'Brien v. Page Lumber Co.*, 39 Wash.

537, 82 Pac. 114; *Dossett v. St. Paul & Tacoma Lumber Co.,*
40 Wash. 276, 82 Pac. 273; *Eidner v. Three Lakes Lumber
Co.,* 45 Wash. 323, 88 Pac. 326; *Maloney v. Stetson & Post
Mill Co.,* 46 Wash. 645, 90 Pac. 1046; *Ball v. Peterman Mfg.
Co.,* 47 Wash. 653, 92 Pac. 425. In these cases it was held
that the head sawyer was a vice principal; but in each of them
the injured party was an employee who was under his imme-
diate direction and control. The doctrine of these cases is
not that the head sawyer, because of his position as such,
would necessarily and always be a superior officer to all other
employees in the mill; but that he, in the instances then under
consideration, became a vice principal because he had the di-
rection and control of the men immediately assisting him in his
part of the work, because he had authority to send them into
hazardous situations, and to place them where they did not
know of dangerous agencies which he was about to use, and
which he did use without warning them, while they were in
such positions. No such condition exists in this case. In the
*O'Brien* case, where the dogger was injured, this court recog-
nized the doctrine that, although as to co-employees when
performing duties such as those we have mentioned, the saw-
yer was a vice principal, yet that he might, in the discharge
of other duties, be their fellow servant, using the following
language:

"In some respects, the sawyer was a fellow servant with the
appellant. It required the labor of both to place the logs
upon the saw carriage. The appellant attached the log firm-
ly to the carriage so that it might be passed through the saw
by the sawyer. The appellant loosened the logs from the car-
riage so that the sawyer might turn them at the proper time.
In these respects, they were fellow servants, working together,
each having his particular duties in the common employment
of converting logs into lumber."

In the case at bar the head sawyer had no control over the
respondent, in the performance of his duties. As to him, he
was a fellow servant, engaged in the common employment of
manufacturing lumber.

The evidence in this case further convinces us that, as a matter of law, the respondent was guilty of contributory negligence to such an extent as to preclude him from recovering. When he took hold of the cant, he was facing the saw carriage and log. He testified that the saw had then cut into the log only about six feet. The undisputed evidence shows that the log moved about one foot per second of time. The cant was not over fourteen feet in length. Respondent was at the east end of the first section of live rolls, about forty-eight feet from the head saw. The west end of the cant was at least thirty feet from the log. It would require about thirty seconds for the log to advance that distance. All the evidence, other than that of respondent, was that he himself threw the cant diagonally across the rolls, immediately in front of the approaching log. But, accepting his statement to the contrary, he was in a more favorable position to see and watch the approaching carriage than the head sawyer was to watch him and the cant upon the rolls. Respondent had ample time to escape by retreating to the east of the edger, or through the open passageway between the first and second sections of rolls, or down the passageway towards the cut-off sawyer. It is true that he contends these avenues of escape were closed by certain appliances and accumulated lumber. This statement is not only contradicted by all the other witnesses, but cannot be true in the light of the surrounding physical conditions as detailed by respondent and shown by the undisputed testimony of other witnesses. It is either a fact that the passageway between the two sections of live rolls was unobstructed, or that the distance between the west end of the cant and the moving log was much greater than he testified, which latter condition would have afforded him ample time to move the cant.

We have before us a complete map of the mill, made upon an exact scale, and introduced in evidence by the respondent himself. We also have a model of the mill, showing the relative location of all machinery and appliances pertinent to a

careful consideration of this case. The undisputed situation and conditions thus shown compel us to hold the respondent did have ample means of escape. It is manifest from all the testimony that he himself was either reckless or careless, that he needlessly assumed the risk of removing the cant, which he says was in a dangerous position, and that he did so in the face of the approaching carriage, evidently relying upon his ability to so move it before it could be struck by the log. He had every opportunity for observing the danger which threatened him, but failed to get out of the way, although able to do so. We are compelled to hold, under the undisputed evidence, that he was guilty of contributory negligence as a matter of law. It is true that he has been most seriously injured. But this unfortunate fact, coupled with the further fact that he was in appellant's mill, is not of itself sufficient to entitle him to recover. It is necessary that he should show some negligence of the appellant, which he has not done.

The appellant's motion and challenge to the evidence should have been sustained. The judgment is reversed, and the cause remanded with instructions to dismiss the action.

RUDKIN, C. J., FULLERTON, CHADWICK, GOSE, PARKER, MORRIS, and MOUNT, JJ., concur.