[No. 8000. Department One. June 15, 1909.]

CHARLES JACKSON, *Respondent*, v. DANAHER LUMBER COMPANY, *Appellant*.[1]

MASTER AND SERVANT—INJURIES TO SERVANT—ASSUMPTION OF RISKS—CONTRIBUTORY NEGLIGENCE—CUSTOM—QUESTION FOR JURY. An employee who had worked in a mill but seven days does not assume the risks and is not guilty of contributory negligence, as a matter of law, in leaving the mill after work by going over the roller bed in accordance with the custom of the workmen, where there was no safe way especially provided and he was following the head sawyer, who was familiar with the mill, and his injury was due to the raising of a jump saw, without notice or warning, by an employee who was about to file the saw.

MASTER AND SERVANT—FELLOW SERVANTS—DIFFERENT DEPARTMENTS. A saw filer under direction of the foreman of a mill is not a fellow servant of a dogger who works under the head sawyer, as to an injury inflicted by the filer's raising a jump saw without warning, in an unusual manner, just as the dogger was stepping over the slot on his way out of the mill.

Appeal from a judgment of the superior court for Pierce county, Chapman, J., entered October 14, 1908, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained by an employee in a sawmill. Affirmed.

*Hudson & Holt*, for appellant.

*Burkey, O'Brien & Burkey*, for respondent.

CHADWICK, J.—Plaintiff was employed as a dogger in a sawmill operated by defendant at Tacoma, Washington. One

[1]Reported in 102 Pac. 416.

McBane, under whose immediate direction he worked, was head sawyer, and one Marble was filer. It was a part of the plaintiff's duty to assist the head sawyer in changing the band saw at the log carriage in the mill. This work was generally done at noon after the mill had been shut down for the lunch hour. The physical situation of the machinery in the mill was about as it is in all sawmills; a log carriage upon which the logs were placed for cutting carried the logs to the main saw; the cants fell upon a set of live rolls, operated by a first offbearer with a lever arranged for that purpose; the cants were directed over the rolls by a second offbearer, and were either canted over to a set of rollers which would carry them to and through the edger, or they were allowed to pass on to the trimming saw or trimming transfer, and thence on out of the mill. The live rolls ran on a platform about "hip high;" and at a point about thirty feet from the band saw there was a slot, in which, or rather out of which, a jump or cut-off saw was operated by means of a lever which was also controlled by the first offbearer.

It will be seen that, when the band saw was running, it did not follow that the live rolls or jump saw were in motion; their movements depended on a friction clutch which gathered power from the main shaft of the mill. When not raised for the purpose of cutting off long timbers or for the purpose of being changed, this jump saw was concealed. It was the duty of Marble, the filer, to change the jump saw when it had become dulled from use. During the forenoon he had been directed to do this, and at noon, after the band saw had been changed, he set about to do as he had been directed. In this work he was generally assisted by the first offbearer who raised the saw by means of the lever while he blocked it from the floor below.

On this particular occasion, the place of the regular offbearer was filled by a green hand, a Japanese who had no understanding of the English language and who was unfamiliar with the manner of raising the jump saw. Marble

went to the floor below, where he directed the engineer to start the machinery enough to enable him to raise the saw. This he did with the assistance of the engineer. Just after changing the band saw, plaintiff and McBane went to the filing room to change their clothes, and started out of the building. They went down a few steps, crossed over past the levers which we have mentioned and at which no one was standing, stepped on a plank laid parallel with the roller bed and about a foot from the floor, provided for the second offbearer to stand upon, then upon the roller bed, thence along it toward the south end of the mill. McBane had passed over the slot where the jump saw was concealed, but just as plaintiff was passing over it, it was raised by Marble and the engineer from below and, being in motion, cut and injured his foot. This action is prosecuted to recover damages. From a verdict in favor of plaintiff, defendant has appealed.

The assignments of error are three in number: (1) That the court erred in denying appellant's motion for judgment at the conclusion of respondent's testimony; (2) in denying a like motion when all the evidence was in, and (3) in refusing to give a peremptory instruction to the jury to return a verdict for defendant. The defenses relied upon are contributory negligence, assumption of risk, and the doctrine of fellow servant.

The testimony shows that there were four and possibly five ways in which respondent could have departed from the mill at the particular time, and escaped injury; but the testimony fairly shows, and the jury must have found, that there was in fact no way provided especially for such purpose. Respondent might have passed over the log carriage if it had been in proper position, and thence out of the mill by the south door, but in doing so he would have also passed over the roller bed and at some distance from the jump saw; or he might have passed out by way of the opening between the edger and the roller bed. He might have gone out around

the north side of the log carriage, in which event he would have passed over the log chute. It may be seen that, in any event, his way would have led over or by machinery or places dangerous in greater or less degree. There were opportunities to go out of the mill, but no open way inviting the workmen to its use. Furthermore, it was the custom of the workmen to pass in and out over the live rolls. This is abundantly shown by the testimony, and is emphasized by the fact that McBane, the head sawyer, led the way. The custom is also admitted by Marble, the saw filer. McBane was better acquainted with the mill than was the respondent, who had been employed not to exceed seven days, and who had no notice or knowledge of the methods about to be employed by Marble for raising the jump saw.

It is urged that pursuit of a negligent custom cannot be relied upon as a basis for damages. This we admit. But it is a rule that is not without qualification. It is based upon the proposition that there were other safe ways, an assumption which we are not willing to indorse in the instant case. We have said there was no way provided and primarily intended for the use of the workmen in entering and going out of the mill. Workmen were in the habit of using the roller way. The fact that the engine was moving slowly was no notice to the respondent of any danger. He knew that it was customary to raise the jump saw and start the live rolls by the use of the levers provided for that purpose. There was no person at the levers to indicate that either the saw or the rolls might be brought into instant use; and for these reasons we are unwilling to hold, as a matter of law, that respondent assumed the risk or was guilty of negligence in following the custom of the mill hands. In principle we are unable to differentiate this case from the case of *Sturgeon v. Tacoma Eastern R. Co.*, 48 Wash. 366, 93 Pac. 526, wherein the court said:

"The respondent contends that the wood rack in question was not intended for use as a ladder by trainmen in boarding

cars, but there was no testimony on this point. On the other hand, trainmen of years of experience testified that it is customary, not only on respondent's road but on all railroads, for brakemen to board cars such as this in the identical manner in which the appellant attempted to board the car in question. If this custom prevailed and was known to the respondent, or should have been known by the exercise of reasonable diligence, it became its duty to make its wood racks reasonably safe for the purpose for which they were habitually used, regardless of the purpose they were originally intended to subserve."

From the cases in support of the rule that bars a recovery where the servant voluntarily selects an unsafe or dangerous way when he might have selected a safe one, Mr. Labatt deduces this conclusion:

"The rule thus laid down is evidently intended to be applied only when the method adopted was essentially unsafe, and the other was apparently safe. It will be observed that this conception emerges more or less distinctly in the statements of the rule already given. That it determines, whether expressly adverted to or not, the actual extent and scope of the rule is apparent from the consideration that a doctrine which should predicate negligence, as a matter of law, in cases where the servant is merely chargeable with having adopted the less safe of the two courses which were both reasonably safe, would contravene the fundamental principle by which the standard of due care is declared to be the hypothetical conduct of a prudent person under the given circumstances." Labatt, Master and Servant, p. 841.

In *Kingma v. Chicago & N. W. R. Co.*, 85 Ill. App. 138, the court held that it could not hold a section hand, who was struck and injured by a train while walking on the track, when there were several ways over which he could have traveled in safety, guilty of contributory negligence as a matter of law. Such cases must go to the jury under proper instructions based upon the facts of the particular case, saving the question whether the servant did that which an ordinarily prudent man would have done under like circumstances.

Nor do we think that appellant should be excused on the ground that respondent was a fellow servant of Marble. Aside from the questions that arise from the evidence as to their employment, whether common or otherwise, it is admitted that respondent was under the direction and order of the head sawyer, while Marble was under the direction of the foreman of the mill. Respondent had no opportunity of knowing whether Marble performed his work in a careful or negligent manner. These considerations easily bring the case within the rule that the question of fellow servant should not be measured by the rank or station of the employee under whose direction the act was performed, but by the character of the act itself.

In Cooley on Torts (3d ed.), p. 1073, the rule announced in *Mast v. Kern*, 34 Ore. 247, 54 Pac. 950, 75 Am. St. 580, is quoted, among other authorities, as follows:

"The rule 'now unquestionably established and supported by the great weight of authority, both in this country and in England, is that the liability of the master depends upon the character of the act in the performance of which the injury arises, and not the grade or rank of the negligent employe. . . . The true test in all cases by which it may be determined whether the negligent act causing the injury is chargeable to the master, or is the act of a co-servant, is, was the offending employe in the performance of the master's duty, or charged therewith, in reference to the particular act causing the injury? If he was, his negligence is that of the master, and the liability follows; if not, he was a mere co-servant, engaged in a common employment with the injured servant, without reference to his grade or rank, or his right to employ or discharge men, or to his control over them.' "

See, also, *McDonough v. Great Northern R. Co.*, 15 Wash. 244, 46 Pac. 334; *Hammarberg v. St. Paul & Tacoma Lumber Co.*, 19 Wash. 537, 53 Pac. 727; *Mullin v. Northern Pac. R. Co.*, 38 Wash. 550, 80 Pac. 814.

It cannot be denied that it was the duty of the master to provide not only a safe place for the employees to work, but a safe way of going in and coming out of the mill. No way

being provided, the servant adopted a customary way, a safe way but for the raising of the saw in an unusual manner, occasioned by failure on the master's part to employ a competent offbearer who could man the lever and obey the orders given by Marble. If Marble, then, assumed to overcome the dereliction of the master in this behalf by acting without the assistance of a competent man to raise the saw in the customary way, it was his duty to warn other employees whom he knew might, as he admits he did upon occasion, use the roller bed when the mill was not running, as a passageway in and out of the mill. He assumed the duty of the master. His failure to perform his full duty was the proximate cause of the injury, and appellant was rightfully charged with his delinquency. Shannon v. Consolidated Tiger & Poorman Min. Co., 24 Wash. 119, 64 Pac. 169; Nelson v. Willey S. S. & Nav. Co., 26 Wash. 548, 67 Pac. 237; Eidner v. Three Lakes Lumber Co., 45 Wash. 323, 88 Pac. 326; Larsen v. Covington Lumber Co., ante p. 147, 101 Pac. 717.

The judgment of the lower court is affirmed.

RUDKIN, C. J., FULLERTON, MORRIS, and GOSE, JJ., concur.